**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ERIC JOSEPH,<br><br>                    **Plaintiff,**<br><br>vs.<br><br>**THE CITY OF PHILADELPHIA, John Della Rocca, as personal representative of the Estate of Edward Hughes and the Estate of Albert Nespoli; Karen Ansel, as Personal Representative of the Estate of Francis Ansel; James Alexander; Linda Westerman, as personal representative of the Estate of Frederick Westerman, Luis A. Silva, as personal representative of the Estate of John Lanzelotti, Assistant District Attorney Arnold Gordon,**<br>                    **Defendants.** | **Civil Action No.**  2:26-CV-03418<br><br>**Jury Trial Demanded** |

**COMPLAINT**

I.    **Preliminary Statement**

1. This civil action arises from the extraordinary and unconstitutional misconduct of detectives and their supervisors in the Homicide Division of the Philadelphia Police Department, and assistant District Attorney Arnold Gordon, who was the Chief of the Homicide Unit at the District Attorney's Office, which resulted in the wrongful arrest, prosecution, conviction and sentence to life for a murder which Plaintiff did not commit. Mr. Joseph served 41 years, 1 month and 7 days of that life sentence due to that misconduct.

1

2. On February 22, 1984, two armed men forced Adrienn Crosby, an employee of the Metro Fuel Oil Company located at 2138 N. 10th Street in Philadelphia, across the fuel yard and into the offices of the company.

3. Once inside a third robber wearing a ski mask over his face appeared and watched over Mr. Crosby while the two other robbers took another employee, Thomas Dolan, upstairs in search of money in a safe.

4. Upstairs William Gambrell, the manager of the Metro Fuel Oil Company, was shot in an upstairs office while sitting at his desk.

5. The robbers, who were not able to open any safes, then fled with two or three guns stolen from the Metro Fuel Oil Company and money from the pockets of Mr. Crosby and Mr. Dolan.

6. William Gambrell succumbed to his wounds a short time later at Temple Hospital after being rushed there by ambulance.

7. After the defendant detectives and their supervisors knew that they had been given false information implicating Mr. Joseph and his two co-defendants in the murder, and after two Metro Fuel Oil Company employee-eyewitnesses who had previously identified completely different people who did not look anything like Mr. Joseph or his two co-defendants, the defendant detectives in concert and conspiracy with each other and their supervisors, coerced the same two Metro Fuel Oil Company employee-eyewitnesses to make new false identifications of Mr. Joseph and a co-defendant, even though Mr. Joseph and his co-defendant looked nothing like the men originally identified by those witnesses.

2

8. The defendant detectives and their supervisors then intentionally hid and suppressed the original identifications and any statements and other evidence that did not align with the new narrative and based on a false story supplied to the defendant detectives by other suspects, charged Mr. Joseph with a murder he did not commit.

9. Mr. Joseph maintained his innocence throughout the investigation and trial, and the following more than four decades of wrongful incarceration.

10. At Mr. Joseph's jury trial and pre-trial motions, Detectives Alexander, Ansel, and Hughes made intentional material misstatements to the jury and to the Court to hide the intentional suppression of *exculpatory* evidence, coercion, fabrication, malicious prosecution, and other misconduct committed by them and the other individual defendants during the investigation.

11. Those intentional material misstatements are directly contradicted by the statements and other evidence that the individual defendants intentionally kept hidden away in the Homicide file and did not turn over, in order to secure Plaintiff's wrongful conviction.

12. At the conclusion of Mr. Joseph's trial, which was marred by egregious misconduct that was successfully concealed from the defense, the court, and the jury, Mr. Joseph was convicted of murder of the first degree, robbery, conspiracy, and possessing an instrument of crime on October 4th,1984.

13. Mr. Joseph was then put on trial for his life. Since he was found guilty of capital murder, the jury then had to decide in a separate penalty phase trial whether he should be killed by way of a state-sanctioned execution.

14. At the conclusion of his penalty phase trial, On January 30, 1985, at the age of 20, Mr. Joseph was spared the death penalty and sentenced to life without parole for 1st degree murder plus a consecutive 17 ½ to 35 years imprisonment for robbery, conspiracy, and possession of an instrument of crime.

15. On October 1, 2024, after PCRA counsel conducted a review of the Homicide File, a PCRA petition was filed raising multiple *Brady* claims based on 11 pieces of evidence located in the Homicide file which were not contained in the District Attorney File, hereinafter referred to as the DAO file, and which were intentionally suppressed by the defendant detectives and their supervisors. More intentionally suppressed *Brady* material has since been located in the Homicide file, but the 11 pieces of evidence at issue in Mr. Joseph's final PCRA petition, including suppressed statements containing information about multiple alternate suspects which were located in an envelope in the Homicide file marked **"Unreported Interviews"** were more than enough to achieve a vacatur of Mr. Joseph's conviction.

16. On August 25, 2025 the District Attorney's Office, after reviewing the Homicide and DAO files, transcripts, and the court file for eleven months filed a response to Mr. Joseph's PCRA petition agreeing that Mr. Joseph should receive a new trial because the defendant detectives, in violation of Mr. Joseph's constitutional right to a fair trial and due process, suppressed a large amount of exculpatory evidence that would

4

have been favorable to his defense and because that suppression of favorable and exculpatory evidence resulted in a trial that was not fair and its result was not reliable.

17. The PCRA court subsequently granted Plaintiff relief in the form of a vacatur of conviction and ordered a new trial.

18. Finally, on March 6, 2026, the Commonwealth moved to *nolle pros*, and the trial court granted the motion, terminating the prosecution in Mr. Joseph's favor 42 years to the day he was arrested for robbery and murder at the Metro Fuel Oil Company.

19. Mr. Joseph's wrongful conviction and incarceration directly resulted from the defendant detectives' evidence fabrication, coercion, malicious prosecution, intentional suppression of exculpatory evidence, and outright lying on the stand committed by defendant detectives who felt safe and secure in the belief that the evidence they hid, some of it in an envelope labelled "Unreported Interviews" among other suppressed evidence, would never leave the Homicide File.

20. Defendant ADA Arnold Gordan also took affirmative steps in his investigatory capacity, to assist the defendant detectives in fabricating and coercing the second statement of Mark Mitchell in order to obtain false probable cause evidence in the form of a statement from Mark Mitchell which identified Mr. Joseph as one of the robbers.

21. The individual defendants were able to commit wholesale misconduct and actual criminal acts such as perjury, and obstruction of justice, in such safety from fear of consequences due to the City of Philadelphia's publicly known and longstanding

5

practice of failing to supervise, train, and discipline PPD Homicide Detectives to comply with clear and established constitutional requirements, and the City of Philadelphia's publicly known and longstanding acquiescence to established improper police customs, policies and practices.

22. Because the defendant detectives' supervisors, acting pursuant to the aforementioned well-known longstanding systemic failures, facilitated and allowed said misconduct to occur by assisting in the coverup of the misconduct instead of properly supervising to prevent and/or correct said misconduct, the defendant detectives were free to essentially edit out any exculpatory evidence they did not like which contradicted the official police narrative of events, rather than just investigate and record the facts, which was their duty.

23. Mr. Joseph brings this civil rights action pursuant to 42 U.S.C. § 1983 to hold the defendants accountable for violating his constitutional rights and causing massive harms and losses he suffered as a direct result of said violations.

## II.    Jurisdiction and Venue

23. The Court has subject matter jurisdiction over this Complaint via 42 U.S.C.  § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

24. The Court has supplemental jurisdiction over Plaintiff's state law malicious prosecution claim via 28 U.S.C. § 1367(a).

25. Venue is proper in this district under 28 U.S.C. § 1391(b) in that all claims arose in this district.

## III.    Parties

26. Plaintiff, Eric Joseph, is 61 years old, and he was at all times relevant to this Complaint, a resident of the City and County of Philadelphia in Pennsylvania.

27. Defendant, City of Philadelphia, is a municipality located in Pennsylvania which owns, operates, manages, directs, and controls the Philadelphia Police Department, and which, at all times relevant to this Complaint, employed the individual defendants listed below.

28. Defendant, Karen Ansel, is the personal representative of the Estate of Francis Ansel, Badge No. 906, who was at all times relevant to this Complaint, a Philadelphia Police detective in the Homicide Division of the Philadelphia Police Department. Karen Ansel is sued in her capacity as the personal representative of Defendant Detective Francis Ansel's estate.

29. Defendant, John Della Rocca, is the personal representative of the Estate of Edward Hughes, Badge No. 642, who was at all times relevant to this Complaint, a Philadelphia Police detective in the Homicide Division of the Philadelphia Police Department. John Della Rocca is sued in his capacity as the personal representative of Defendant Detective Edward Hugh's estate.

30. Defendant, Detective James Alexander, Badge No. 9147, was at all times relevant to this Complaint, a Philadelphia Police detective in the Homicide Division of the Philadelphia Police Department and acting under color of state law. Defendant, Detective James Alexander, is being sued in his individual capacity.

31. Defendant, John Della Rocca, is the personal representative of the Estate of Albert Nespoli, Badge No. 9101, who was at all times relevant to this Complaint, a

Philadelphia Police detective in the Homicide Division of the Philadelphia Police Department. John Della Rocca is sued in his capacity as the personal representative of Defendant Detective Albert Nespoli's estate.

32. Defendant, Linda Westerman, is the personal representative of the Estate of Frederick Westerman, Badge No. 533, who was at all times relevant to this Complaint a Philadelphia Police Seargent in the Homicide Division of the Philadelphia Police Department. Linda Westerman is sued in her capacity as the personal representative of Defendant Seargent Frederick Westerman's estate.

33. Defendant, Luis A. Silva, is the personal representative of the Estate of John Lanzelotti, Badge No. 349, who was at all times relevant to this Complaint a Philadelphia Police Lieutenant in the Homicide Division of the Philadelphia Police Department. Luis A. Silva is sued in his capacity as the personal representative of Defendant John Lanzelotti's estate.

34. All of the defendant detectives and supervisors were, at all relevant times material to this complaint, acting under color of state law within the scope of their employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of Philadelphia in the Philadelphia Police Department.

35. Defendant, Arnold Gordon, was at all times relevant to this Complaint, the Chief of the Philadelphia District Attorney's Office's Homicide Division and acting under color of state law within the scope of his employment at the Philadelphia District Attorney's Office. Defendant Arnold Gordon is sued in his individual capacity.

36. At all material times relevant to this Complaint, Defendant, City of Philadelphia

8

acted or failed to act by and through its agents, servants, and/or employees who were acting within the course and scope of their employment under color of state law.

37. At all material times relevant to this Complaint the individual defendants acted in concert and conspiracy with each other and were responsible jointly and severally for the harms they caused to Plaintiff.

1.  **Facts**

38. On February 22, 1984 at about 4:45pm, William Gambrell, the manager of the Metro Fuel Oil Company located at 2138 N. 10th Street was shot two times during a robbery while sitting in a chair behind his desk in his office on the second floor of the business.

39. Eyewitness, Adrienn Crosby, an employee at the Metro Fuel Oil Company who was also a nephew of William Gambrell, gave the following descriptions of the three robbers to a police officer and a detective:

    a.  [The man originally identified as Ernest Owens but then later identified as co-defendant Herbert Baker] The shorter of the two unmasked men, the man who announced a robbery, 5'7" tall, 135lbs, 18-19 years old, wearing a dark jeff cap or cool cap and maybe a brown waist-length jacket but he wasn't sure about the jacket.

    b.  [The man originally identified as Nicholas Johnson but then later identified as Mr. Joseph] 6' tall or 6' 1 ½" or a little smaller, 165lbs wearing a dark blue short jacket with a fur collar or a ¾ length jacket below the waist that Mr.

9

Crosby thought was brown, 21-22 years old, medium brown complexion, mustache, wearing a hat similar to the first male but different style;

    c. [The masked robber] 5'11" tall or 6' tall, 190lbs, stocky build wearing a light colored or light blue ski mask covering his face and wearing a brown short jacket or a waist length blue jacket that was snug around the waist.

40. Thomas Dolan, another employee and eye-witness, gave the following descriptions of the three robbers to Police Officer Don Irons:

    a. Dark complected, 18-23 years old, 5'6" tall, 150lbs wearing dark pants and a blue short jacket;

    b. Dark complected, 18-23 years old, 5'6" tall, 150lbs wearing dark ski cap;

    c. Dark complected, 18-23 years old, 5'8" tall, 160lbs wearing a ski cap.

41. On that same night Mr. Dolan gave the following descriptions to Detective Brown:

    a. [The man originally identified as Ernest Owens but later identified as Herbert Baker] Black male 18-23 years old, around 5'6" 155lbs slender but well-built, dark brown skin, no facial hair, close cut hair, wearing dark colored clothes, maybe a waist length jacket;

    b. [Mr. Dolan did not identify Mr. Joseph in court or out of court, but he did identify a man named Leonard Edwards who was not charged, the man covered by this description was presented as Mr. Joseph by the Commonwealth at trial] Black male 5'8" slender maybe 155lbs, medium brown skinned, wearing possibly a multi-colored ski cap and a dark jacket;

    c. [The masked robber] Black male 5'6" wearing a ski mask covering his face.

10

42. Mr. Joseph, who was referred to at that time by people who knew him, and also in police paperwork, as "Fat Rick," weighed 205 pounds, making him much heavier than the man the Commonwealth argued at trial was Mr. Joseph as that person was described by Mr. Crosby and Mr. Dolan.

43. From interviewing Adrienn Crosby, Thomas Dolan, and other witnesses, the police determined that two men not wearing masks had walked South past the Metro Fuel Oil Company on N. 10th Street while Adrienn Crosby was in the fuel yard where he would pump kerosene for customers.

44. Those two men came back North on N. 10th Street a short time later towards Mr. Crosby who was then standing on the sidewalk outside of the closed gate through which one would enter the Metro Fuel Oil Company fuel yard.

45. Mr. Crosby said these two men pulled out guns, one of them announced a robbery and then the two men walked him into and across the yard and then into the office building of the Metro Fuel Oil company where Mr. Crosby was made to lay face down on the floor when a third man wearing a ski mask appeared and watched over him while the two unmasked men took Thomas Dolan, who had been sitting in his office downstairs, upstairs with them.

46. Mr. Dolan told the police that the two men who took him upstairs walked him towards Mr. Gambrell's office before the shorter of the two men shot Mr. Gambrell after which the men, who were not able to get into any of the company safes, ran downstairs.

47. Mr. Crosby heard the shots and heard someone yell "get the shotgun" and then the

two robbers who were upstairs ran back downstairs and then all three men ran out of the building.

48. Taken from the Metro Fuel Oil Company during the robbery were the money in Mr. Crosby's and Mr. Dolan's pockets, a .357 magnum that Mr. Gambrell had in a holster on his person, a shotgun, and possibly a rifle.

49. A witness told police that she observed three men running North onto the 2200 block of N. Delhi Street with two carrying long guns, before fleeing the scene in a green and black car.

50. On February 25, 1984, Thomas Dolan was shown photographs of suspects by Defendant Detective Alexander.

51. During this photo identification procedure Thomas Dolan identified two men, Ernest Owens as definitely one of the unmasked robbers and Leonard Edwards as looking like the other unmasked robber.

52. Neither of these men looked anything like Mr. Joseph or Mr. Baker which is why the defendant detectives later hid the existence of Mr. Dolan's February 25, 1984, photo identifications.

53. Also on February 25, 1984, Adrienn Crosby was shown photographs of suspects by Detective Brignola.

54. During this photo identification procedure Adrienn Crosby identified Ernest Owens as definitely one of the unmasked robbers, and a man named Nicholas Johnson as looking like the other unmasked robber, but Mr. Crosby was not certain.

55. Mr. Crosby also identified a third person named Bruce Cooper, who had come into

12

the fuel yard asking about jobs. Mr. Crosby told Detective Brignola that Mr. Cooper left when told there were no openings and then a customer told Mr. Crosby to watch Bruce Cooper because he was bad news.

56. Ernest Owens and Nicholas Johnson looked nothing like Herbert Baker and Mr. Joseph which is why the defendant detectives intentionally concealed the existence of this photo identification.

57. The defendant detectives also hid the existence of this photo identification session and statement because Bruce Cooper was an alternate suspect connected to several other alternate suspects, the existence of whom the defendant detectives also intentionally concealed from the defense and the prosecuting attorney since that additional evidence also undermined their official narrative of the case.

58. At around 4:00am on March 4th, 1984, Mr. Joseph and Mark Mitchell were arrested by Detective Frank McCloskey and taken to the North Central Detective Division at 17th and Montgomery Streets in Philadelphia.

59. While Mr. Joseph was there, he could hear Mr. Mitchell being beaten in the next room over.

60. Mr. Joseph was also struck by multiple police officers while at the North Central Detective Division and questioned about the robbery and murder at the Metro Fuel Oil Company.

61. After both men were softened up by police beatings for three or four hours at the North Central Detective Division, Detective McCloskey, a former homicide detective, shipped Mr. Joseph and Mr. Mitchell off to the Homicide Division.

13

62. In 1984 in Pennsylvania, due in large part to concerns of coercion, the courts were prohibited from allowing into evidence statements taken from arrestees who had been in custody for more than six hours.

63. Since Mr. Joseph was arrested at 4:00am, and since Adrienn Crosby and Thomas Dolan had positively identified completely different men who did not look like Mr. Joseph the defendant detectives only had until 10:00am to get a signed statement from him admitting involvement in the robbery.

64. The defendant detectives were unsuccessful in obtaining a false confession from Mr. Joseph that day, so he was not charged for the robbery/murder at that time.

65. Since Mr. Mitchell was arrested at 4:00am, and since the defendant detectives wanted Mr. Mitchell to be the robber who had worn a ski mask during the robbery and could therefore not be identified, the defendant detectives only had until 10:00am to get a signed statement from him admitting involvement in the robbery murder or they could not charge Mr. Mitchell for the robbery/murder.

66. Defendant Hughes started his interrogation of Mr. Mitchell at 9:20am.

67. Defendant Hughes took a statement from Mr. Mitchell using a typewriter by seeking out and then hitting one letter at a time.

68. At trial, Defendant Hughes referred to this method of utilizing the typewriter as the "search and destroy" method.

69. Defendant Detective Edward Hughes fabricated a false statement and coerced Mr. Mitchell, who had already suffered a prolonged beating, to sign it.

70. Defendant Hughes fabricated, poorly, a false statement and coerced Mr. Mitchell into

14

signing it, knowing it was a false statement.

71. Defendant Hughes falsely testified at trial that he was able to read Mr. Mitchell his rights, get him to waive his rights, and then, though he was not able to type without looking down at the keyboard and looking for each letter, pressing down on the letter, and then moving on to look for the next letter, was able to obtain a three-page confession from Mr. Mitchell stating that Mr. Mitchell robbed the oil company along with Herbert Baker and Mr. Joseph, which Mr. Mitchell then reviewed and then signed by 9:45am, which was twenty-five minutes after Defendant Hughes sat down with Mr. Mitchell, all before Mr. Mitchell was arraigned at 9:57am, just in time to satisfy the six hour rule.

72. Defendant Hughes also falsely testified at trial that there was no one in the room with him and Mr. Mitchell when he was taking the statement, but that somehow someone else from the Homicide Division called up to the arraignment courtroom prior to 9:45 to tell court staff that Mr. Mitchell would be arraigned on murder and robbery charges prior to 10:00am, even though the only probable cause evidence justifying Mr. Mitchell's arrest was the fabricated and coerced statement that Mr. Mitchell had not given to police yet.

73. Mr. Mitchell challenged this statement on a motion to suppress because it was coerced and fabricated, and that motion was denied by Judge Albert Sabo. Mr. Mitchell has a pending timely PCRA petition challenging his conviction based on the very same evidence and claims which led to the overturning of Mr. Joseph's conviction.

15

74. Though Mr. Mitchell was arraigned on March 4, 1984 at 9:57am for robbery and murder, Mr. Joseph was not charged at that time because the defendant detectives did not have and had not yet fabricated and coerced, enough evidence to charge and prosecute him. Although an identification made by one purported co-conspirator of the other is enough to establish probable cause where that identification is not fabricated as it was in this case, it is not enough evidence to prosecute where those co-conspirators are tried together due to *Bruton* which does not allow one non-testifying defendant's statement to be read to a jury regarding a co-defendant at a consolidated trial.

75. At the same time that Defendant Detective Hughes was fabricating Mr. Mitchell's false confession, Defendant, Detective Ansel was unsuccessfully attempting to get Mr. Joseph to confess to the crimes he had not committed.

76. After failing to get Mr. Joseph to falsely confess, Detective Ansel went out on that same day, March 4, 1984, and coerced new fabricated photo identifications out of Mr. Dolan and Mr. Crosby to corroborate the new police narrative of the crime based on Mark Mitchell's fabricated and coerced statement.

77. The new false photo identification of Mr. Joseph purported to have been made by Adrienn Crosby now gave the defendant detectives the paperwork they needed to charge and prosecute Mr. Joseph, so Defendant Nespoli had Mr. Joseph brought back to the Homicide Division on March 6, 1984, and had him charged for the robbery and murder based on the March 4, 1984 false photo id that was coerced from Mr. Crosby by Defendant Detective Ansel and based on the fabricated and coerced March 4,

1984 Mark Mitchell purported statement.

78. Prior to 2024 when all of the hidden evidence came to light, as far as everyone except the defendant detectives and their supervisors and ADA Gordon knew, Adrienn Crosby was only shown photographs of suspects on March 4, 1984, when he identified Mr. Joseph from a photo array as one of the two unmasked robbers after being shown photographs by Detective Ansel at around 3pm that day.

79. Prior to 2024 when all of the hidden evidence came to light, as far as everyone except the defendant detectives and their supervisors and ADA Gordon knew, on March 4, 1984, Thomas Dolan identified co-defendant Herbert Baker from a photo array as looking like the unmasked robber who did the shooting after being shown photographs by Detective Ansel at around 1pm that day.

80. The defendant detectives and their supervisors were aware that the March 4, 1984 statement was coerced and fabricated by Defendant Hughes and did not make any sense. This is evidenced by notes in the homicide file written by the assigned detective, Defendant Nespoli, which noted that Mark Mitchell's statement did not corroborate the get-away car, the guns taken from the robbery, or really talk about the co-conspirators.

81. Witnesses had told police that they had seen men running away from the direction of the Metro Fuel Oil Company on N. Delhi Street from French Street, a small side street that ran East from the entrance of the Metro Fuel Oil Co. over to N. Delhi street.

82. A witness said the men got into a green and black get-away car on the 2200 block of N. Delhi Street and that two of those men were carrying long guns, but Mark

Mitchell's March 4, 1984 purported statement did not mention any of this.

83. Mr. Mitchell's purported statement was problematic for the defendant detectives because it claimed that Mr. Mitchell and his co-conspirators fled South on N. 10th Street to Diamond Street, then West over to N. 11th Street, and then ran North on N. 11th Street for six city blocks where Mr. Mitchell just went home to 2443 N. 11th Street.

84. For the March 4, 1984 Mitchell purported statement to be true three armed men, two carrying long guns, at around 5:00pm on a Wednesday when everyone was coming home from work and nearby Temple University, ran 6 city blocks in a straight line in broad daylight and no one saw it.

85. There is no paperwork in the Homicide file showing that detectives surveyed the neighborhoods along this escape route for possible witnesses, because the Detectives knew this made no sense and was not true so they did not bother to investigate for witnesses who could not have seen what did not happen.

86. Mr. Mitchell's purported statement also contradicted virtually every other fact given to police by Mr. Crosby and Mr. Dolan except for the fact that Mr. Gambrell was shot and two robbers went upstairs and one stayed downstairs.

87. Mr. Mitchell's purported statement said that all three robbers walked into the Metro Oil Company offices together and asked about jobs, and then Mr. Mitchell, who had presumably not walked into the oil company asking about jobs while wearing the ski mask over his face, noticed that Mr. Baker had pulled out a gun and was now robbing the place.

88. Mr. Mitchell's purported statement also said that the three men were walking down

10th Street and the idea just came up to rob the place and then they just walked over there.  Whether the robbery was planned or whether it happened organically as the three men were asking about jobs, none of that could have happened since Mr. Crosby told the police that he was only approached by two men (neither of them Mr. Mitchell) who pulled guns on him outside the fuel yard gate, and then walked him through the yard, and then a masked man, who was purportedly Mr. Mitchell, first appeared inside of the Metro Fuel Oil Company offices.

89. Mr. Crosby told police and the jury that he didn't see anyone else out on the block when he was accosted outside the fuel yard, whereas the March 4, 1984, Mitchell purported statement said Mr. Mitchell was with the other two robbers when they entered the building.

90. Recognizing the issues with Mr. Mitchell's statement, Defendant Nespoli, wrote in his notes in the Homicide file that he should re-arrest Mr. Mitchell to get another statement from him, and according to the activity sheets, he consulted with defendant ADA Arnold Gordon, Chief of the District Attorney's Homicide Unit about the problems posed by Mr. Mitchell's March 4, 1984 statement.

91. Defendant ADA Gordon then approved a new arrest warrant for Mark Mitchell for the robbery of Thomas Dolan, even though Detective Nespoli and ADA Gordon had more than enough evidence to add on the robbery charge for the $17.00 taken from Mr. Dolan's pockets based on Mr. Dolan's statement to police and Mr. Mitchell's purported admission to participating in the robbery if that had really been the purpose of Defendant Gordon's approval of the new arrest warrant.

19

92. The true purpose of ADA Gordon's approval of this new arrest warrant for the robbery of Thomas Dolan was of course to aid Defendant Nespoli in trying to clean up the fabricated and coerced March 4th Mitchell purported statement to make it sound more believable.

93. Under the pretense of this new robbery charge, approved by Defendant ADA Gordon, the defendant detectives brought Mr. Mitchell back to the Homicide Division on March 6th, and even though Mr. Mitchell was already represented by counsel for murder and robbery at the Metro Fuel Oil Company, the detectives then isolated Mr. Mitchell in an interrogation room in the Homicide Division without his attorney of record in blatant violation of the 6th Amendment, allegedly to question him about the robbery of Thomas Dolan.

94. Defendant Detective Ansel wrote down this new statement with help from defendant Detective Nespoli who was recording a witness chronology.

95. The false pretense of the Dolan robbery arrest on March 6, 1984 was then shattered upon the very first question that Detective Ansel wrote in the new fabricated and coerced statement which was "Mark, I'm going to ask you additional questions concerning the murder of William Gambrell during the robbery of the Metro Fuel Oil Co. on 2-22-84. Do you understand?"

96. In fact, Defendant Ansel did not bother to write a single question about Thomas Dolan, either by name or reference, in the entire new fabricated and coerced statement that was done purportedly for the purpose of investigating the robbery of Thomas Dolan.

97. Detective Ansel did, however, write in questions and answers about a getaway car and guns taken from the Metro Oil Co., to try to shore up Mr. Mitchell's first statement which did not mention any guns taken and which said that the robbers ran 6 city blocks back to the projects and not that they used a getaway car two blocks East of the escape route that the March 4, 1984 Mitchell statement described.

98. This new fabricated statement did clean up the narrative from the first Mitchell statement which said that the three had gone into the oil company looking for jobs and then the robbery just sort of happened.

99. Detective Ansel wrote in the new statement, falsely, that Mark Mitchell was now saying that he and Mr. Joseph had gone into the Metro Fuel Oil Co. looking for jobs earlier that afternoon and had spoken with the white guy (Thomas Dolan was the only white male Metro Oil employee in the office that day), who told Mr. Mitchell and Mr. Joseph that they had to come back when the manager was in.

100. Not surprisingly, none of the witnesses inside the Metro Fuel Oil Co. ever mentioned that two of the robbers had stopped in to ask Thomas Dolan for a job a little before coming back and robbing the place a short time later wearing the same clothes, but Detective Ansel was severely hamstrung in his efforts to fabricate the new statement due to the first poorly fabricated Mitchell statement from March 4, 1984.

101. In the March 6, 1984 Mitchell statement Detective Ansel also fabricated a new story about a fourth co-conspirator named Chris Jews, a person Mark's Mitchell's March 4,1984 statement had not mentioned at all. The note Detective Nespoli wrote in the homicide file about Mark Mitchell's March 4, 1984, purported statement not making

sense specifically mentions the fact that this statement did not mention Chris Jews at all as one of the statement's many problems. Detective Ansel added this fabricated statement about Chris Jews to clear up that issue as well.

102.  Mr. Mitchell filed and argued a motion to suppress the March 6, 1984 purported statement which was coerced, fabricated, and taken in violation of his 6th Amendment right to counsel, however judge Sabo denied that motion.

103.  On March 7, 1984, Herbert Baker contacted P/O Joseph Zernicki to arrange for his arrest because he knew police had a warrant for him in relation to the William Gambrell murder.

104.  That same night pursuant to the arrangement, P/O Joseph Zernicki arrested Herbert Baker at his father's house and transported him to the Homicide Division.

105.  While Herbert Baker was sitting outside of an interrogation room, waiting to be questioned by Detective Graham, he was given the March 6, 1984 statement of Mark Mitchell to read.

106.  Herbert Baker then read this statement which said that he had participated in the robbery/murder and that he and he alone had murdered William Gambrell.

107.  While reading this statement, Herbert Baker asked for P/O Zernicki's help in reading some of the words in the statement because they were handwritten in cursive by Detective Ansel.

108.  P/O Zernicki admitted at trial to helping Herbert Baker read the March 6, 1984 statement.

109.   When Herbert Baker was taken into the interrogation room by Detective Robert

22

Graham, Graham used the fabricated and coerced Mark Mitchell statement to coerce a fabricated statement out of Herbert Baker, telling Baker that he had better help himself out with his own statement because Mark Mitchell was pinning the murder on him.

110. Herbert Baker's coerced and fabricated statement filled in the remaining gaps that Detective Nespoli's notes had mentioned about Mark Mitchell's first statement, by mentioning the rifles, co-conspirators, the correct escape route, and a get-away car.

111. Herbert Baker moved to suppress this statement due to it having been coerced and false, but Judge Sabo denied that motion.

**Trial**

112. Later that year, the Commonwealth tried petitioner Eric Joseph, alongside his two co-defendants, for William Gambrell's murder and the robbery.

113. The prosecution's theory of the case was that the three men robbed the Metro Fuel Oil Company, and during said robbery one of Mr. Joseph's co-defendants, Herbert Baker, shot and killed William Gambrell.

114. At trial Adrienn Crosby, the nephew of the deceased, identified Mr. Joseph, along with co-defendant Herbert Baker, as the two unmasked men he saw rob the oil company.

115. These identifications are directly contradicted by the original identifications Mr. Crosby made of Ernest Owens, Nicholas Johnson, and Bruce Cooper, but because the defendant detectives and their supervisors hid the existence of that original photo lineup and the related identifications and statement, the jury never heard about it and

23

Mr. Crosby was never questioned about it to test the accuracy of his identifications and his credibility and the integrity of the investigation.

116.  Adrienn Crosby was the only witness at trial to identify Mr. Joseph being inside the Metro Oil Company during the robbery, and the jury never heard the parts of the Baker and Mitchell coerced and fabricated statements which falsely inculpated Mr. Joseph due to the trial court's practice of redacting mention of one defendant in another's statement to comply with *Bruton* where, as here, neither of Mr. Joseph's co-defendants testified at trial.

117.  At trial Thomas Dolan identified Herbert Baker as the shooter of the deceased.

118.  This identification was contradicted by Mr. Dolan's original identification of Ernest Edwards and Leonard Edwards, but because the defendant detectives and their supervisors hid the existence of that original photo lineup and the related identifications and statement, the jury never heard about it and Mr. Dolan was never questioned about it to test the accuracy of the identification, his credibility, and the integrity of the investigation.

119.  Thomas Dolan further testified that Herbert Baker was the only person he could identify because he didn't get to see the faces of the other two people, which is directly contradicted by the fact that he identified two people during his original photo identification procedure, but since that original photo lineup procedure and related statement and identifications were hidden by the defendant detectives and their supervisors, Mr. Dolan was never questioned about that contradiction

120.  Because the original photo identifications made by Mr. Dolan and Mr. Crosby were

24

hidden in the Homicide file for forty years, the jury was also deprived of the opportunity to hear about how the identifications of Mr. Joseph and Mr. Baker could be accurate when Mr. Dolan and Mr. Crosby picked out completely different men who looked nothing like Mr. Joseph and Mr. Baker.

121.  Detective Nespoli also placed the photographs of Ernest Owens and Herbert Baker side-by-side where he could clearly see that the two men looked nothing alike. Rather than have to explain this fly in the ointment, Detective Nespoli secreted the original photo identifications and any mention thereof into a corner of the Homicide file and left them there hidden, along with a plethora of other exculpatory evidence which the defendant detectives and their supervisors were bound to hand over to the defense but instead intentionally concealed.

122.  At the conclusion of the Capital Murder trial the jury, without the benefit of a fair and impartial examination of the evidence, convicted Mr. Joseph and his co-defendants of first-degree murder and related offenses.

123.  Mr. Joseph was spared the death penalty at the penalty phase trial.

124.  Mr. Joseph was handed down an aggregate sentence of life without parole plus 17 ½ to 35 years in prison.

125.  On October 1, 2024, after PCRA counsel conducted a review of the Homicide File, Petitioner filed an Amended PCRA petition raising multiple *Brady* claims based on newly discovered evidence found in the Homicide File that had been in the control of the Commonwealth and had presumably not seen the light of day in over forty years.

126.  On August 25, 2025, the District Attorney's Office filed a response in which it

conceded that Mr. Joseph's convictions should be vacated due to multiple glaring *Brady* violations wherein the Commonwealth suppressed a large amount of material evidence thereby depriving Mr. Joseph of his right to a fair trial.

127. On September 17, 2025, the PCRA Court granted relief and vacated Mr. Joseph's convictions.

128. On Friday, March 6, 2026, 42 years to the day that he was arrested for murder, the Commonwealth, because it had no confidence in the reliability of the identification Mr. Crosby made of Mr. Joseph, moved to *nolle pros* and the trial Court granted the motion thereby terminating the proceedings in favor of Mr. Joseph.

129. Mr. Joseph was released from SCI Chester on the following Monday, March 9, 2026

**Evidence Intentionally Hidden by the Defendant Detectives and Their Supervisors Thereby Depriving Mr. Joseph of a Fair Trial**

130. The 11 pieces of evidence located in the homicide file in 2024, and not in the DAO file, which were conceded to by the District Attorney's Office as having been unlawfully suppressed by the police, i.e. withheld from the trial prosecutor and the defense, in violation of *Brady v. Maryland* are:

   I. A manilla envelope titled "**UNREPORTED INTERVIEWS**" containing statements of witnesses which contained exculpatory and impeachment material that the defendant detectives intentionally suppressed.

   II. The statement of Larry Tucker, an employee of the oil company who was suspiciously absent from work on the day of the robbery and who told Detective Nespoli that his cousins Tyrone and Bruce Cooper had planned to rob the oil company with a man named Edmund Jones. Mr. Tucker told Detective Nespoli

26

that his cousins had been planning the robbery for weeks and they had been asking Mr. Tucker questions about the operations of the Metro Fuel Oil Co. regarding the money stored there. Mr. Tucker also told Detective Nespoli that an earlier statement he gave that day about having heard that people named Mark, Herbie, and Chris Jews were responsible for the robbery, was false and that Mr. Tucker's cousin Tyrone Cooper knew that Mr. Tucker would be talking to the police and Tyrone Cooper told Mr. Tucker this false story to tell the police.

III. The statement and Criminal Extract of Tyrone Cooper who told defendant Detective Edward Hughs and Detective Daniel Lynch, that in fact it was Larry Tucker and Edmund Jones who had been planning to rob the oil company with one of the sons of the deceased, also named William Gambrell. At that time Tyrone Cooper's Criminal Extract showed that he had prior charges and convictions for burglary, robbery, attempted murder, and other related charges;

IV. A handwritten note penned by defendant Detective Nespoli, the assigned detective, stating that two days after the murder an anonymous caller implicated Larry Tucker as the inside man and Tyrone and Bruce Cooper as the ones responsible for the robbery/murder.

V. A typed letter dated February 29, 1984, from Detective Nespoli to Ed Balog of the South Carolina Department of Corrections Records Office asking after Ernest Owens. This same letter also has a handwritten response on it from Ed Balog which says "YOUR OWENS AND OURS IS THE SAME MAN – BUT HE HAS BEEN LOCKED UP IN THE SC DEPT OF CORRECTIONS SINCE 1980. HE HAS BEEN IN

27

ADMIN SEGR[EG]ATION SINCE 10-13-83. COULD NOT HAVE BEEN IN PHILA. 2 – 84."

VI.    A police activity sheet dated February 25, 1984 stating that Detective Nespoli was the assigned detective and Lt. Lanzelotti was supervising, recording that on February 25th, 1984, after Adrienn Crosby and Thomas Dolan both identified Ernest Owens as well as Nicholas Johnson, Bruce Cooper, and Leonard Edwards in connection with the robbery "Detective Nespoli consulted with ADA Arnold Gordon Chief of the Homicide Unit who gave the O.K. for the arrest warrant of Ernest Owens, charging him with Murder, Robbery, P.I.C., and Conspiracy."

VII.    A statement taken by Detective Brignola from Adrien Crosby on 2/25/1984, three days after the murder who identified from photo arrays Ernest Owens as "definitely" one of the robbers, along with Nicholas Johnson as possibly the other of the two robbers who were not wearing ski masks over their faces. This statement also says that Adrienn Crosby identified a photograph of Bruce Cooper(the cousin of Tyrone Cooper and Larry Tucker) as having walked into the oil company on the day of the robbery, asked about jobs, and then walked out. Mr. Crosby also said stated therein that Larry Tucker's story about not being at work on the day of the robbery because he was spending $1,000 that William Gambrell, the decedent, had loaned to him was unlikely because William Gambrell was not known to be so generous and had specifically declined to loan that money to Larry Tucker previously.

VIII.    A statement taken by defendant Detective James Alexander from Thomas Dolan

three days after the murder wherein he identified from photo arrays Ernest Owens and a man named Leonard Edwards as the two unmasked suspects.

IX.   Criminal extracts for Leonard Edwards, Bruce Cooper, and Nicholas Johnson showing that Edwards had been convicted of robbery and related offenses, Cooper had been charged and convicted multiple times for robbery and firearms offenses, and Johnson was charged in 1983 with murder, burglary, and related offenses.

131.   Additional evidence located in the Homicide file that was intentionally hidden by the defendant detectives from the trial prosecutor and the defense, includes, but is not limited to the following:

I.   A note in the homicide file written by the assigned Detective, Defendant Nespoli, which notes a problem in the fact that the original photo identifications made by Mr. Crosby and Mr. Dolan now contradict the newer photo identifications which were coerced out of them by defendant Detective Ansel on March 4, 1984, and discusses the fact that Mr. Mitchell's first coerced statement was problematic and suggests re-arresting Mr. Mitchell for the robbery of Mr. Dolan prior to Wednesday, March 7, 1984 so that his interview could be redone.

II.   A note titled "Notifications" made by defendant detective Nespoli which states that ADA Gordon approved an arrest warrant for Ernest Owens and a search warrant for his last known arrest

III.   Arrest warrant and Affidavit of Probable Cause dated February 25, 1984, for Ernest Owens completed by Detective Robert Kane;

IV.    Search warrant and Affidavit of Probable Cause dated February 25, 1984, for Ernest Owens' last known address and property receipts from the search completed by defendant Detective Ansel;

V.    The photo spread shown by Detective Brignola to Mr. Crosby on February 25, 1984;

VI.    The Photo spread shown by Detective Defendant Alexander to Mr. Dolan on February 25, 1984;

VII.    A letter to the District Attorney's Office requesting a fugitive from justice warrant for Ernest Owens;

VIII.    Memorandum from the Homicide Division to the Major Crimes Division requesting a Wanted Person Circular to go out to all districts and divisions for Ernest Owens;

IX.    A wanted computer message for Ernest Owens completed by Defendant Westerman requesting entry of a wanted card into the NCIC;

X.    An Info Sheet recording that a man named Jim Lawrence told Detective Brignola that his stepson, Hassan Sistrunk, might be involved in the Metro Oil Robbery because he heard that Hassan had stolen a car for this robbery and also that Tony Gambrell, one of Mr. Gambrell's sons, said that he heard on the street that Hassan Sistrunk, and someone named Jerome were involved in the shooting;

XI.    Additional mug shots, including an array containing Mr. Joseph, Mr. Baker, and Mr. Mitchell along with Nicholas Johnson and Bruce Cooper, with the Nicholas Johnson and Bruce Cooper photos signed and dated by Mr. Crosby on February

25, 1984 while the photographs of Mr. Joseph, Mr. Baker, and Mr. Mitchell are not signed, indicating that Mr. Crosby viewed Mr. Joseph's photograph on February 25, 1984 and did not identify him;

XII.   Criminal extract of Hassan Sistrunk showing prior arrests for robbery, firearms offenses, and theft of motor vehicle offenses;

XIII.   Criminal Extract for suspect Anthony Berry showing multiple prior arrests;

XIV.   Criminal Extract for suspect William Gambrell, son of the decedent, showing a prior arrest in 1982 for aggravated assault and possession of weapon charges (this piece of withheld information should be taken into context with the fact that Tyrone Cooper told Detective Lynch and Defendant Detective Hughes that William Gambrell's son, also named William, planned the robbery and also taken into context with the fact that another of William Gambrell's sons, Richard Gambrell, told Defendant Detective Ansel that William had been caught stealing money from the Metro Oil Company a few weeks prior and the defendant detectives knew that William had worked at the Metro Oil Company but had been fired after stealing the money, all of which led the defendant detectives to consider William a suspect;

XV.   Statements of Sandra and Samuel Arrington taken by Detective Brignola, and statement of Jerry Deloatch taken by defendant Detective Nespoli, criminal extract of Jerry Deloatch showing multiple prior arrests, along with police officer reports called 75-48's, and police officer statements related to these people because they had cars matching the description of the getaway car and Mr.

Arrington's car was positively identified by an eye-witness who told Defendant Detective Ansel that the car she identified was the actual getaway car, and a property receipt for Mr. Arrington's car because it was seized by police officers to show it to the eyewitness who positively identified the car by color and by the damage to a corner of the rear license plate;

XVI. A note about the chronology of Larry Tucker's two statements and lie detector tests showing when each event occurred;

XVII. Statements taken from two women by defendant Detective Nespoli who were on French Street prior to the robbery and observed two men sitting on the steps of an abandoned house about six houses away from the Metro Fuel Oil Company, acting strangely, and looking over at the Metro Oil Company at about 3:30pm;

XVIII. The statement of Michael Burgee, taken on February 28, 1984, who told Detective Thomas that he overheard two males talking about the robbery at the Metro Fuel Oil Company and that one of the males who was 5'6" to 5'7" 160 pounds, stocky, 19-20 years old, dark complected black male with short black hair said "Yeah that's the place. The guy made me bust him." The statement records the fact that Mr. Burgee was shown Mr. Joseph's photo, among others, and said he recognized most of the photos but they weren't the guys he saw talking about the murder and that the guy who said he had to bust somebody was known to Mr. Burgee as always the rowdiest guy playing basketball at the Duckery school and both of the men live on Susquehanna West of 15th, 16th, or Colorado Street.

32

XIX.    The Activity Sheets, which Philadelphia Police Homicide Detectives used to track homicide investigations and record exculpatory information and which were as a rule, and as a policy practice or custom within the Philadelphia Police Homicide Division, purposely withheld from the District Attorney's Office and the Defendants and their lawyers in all cases in the 1980's. The Activity Sheets from the William Gambrell homicide file contain multiple pieces of exculpatory information that were all wrongfully intentionally suppressed and include the following information:

X.    Activity Sheet dated 2/26/84 listing Defendants Lt. Lanzelotti and Sgt. Westerman as supervising and Defendant Detective Nespoli as the assigned, stating that James Lawrence told Detective Brignola that his step-son Hassan Sistrunk was involved in the homicide and also stating that Detectives Brignola, Miller, and Lynch had searched different residences associated with Ernest Owens looking for him and robbery proceeds;

XI.    Activity Sheet dated 2/27/1984 listing Defendant Sgt. Westerman as supervising and Defendant Detective Nespoli as the assigned, stating that a wanted message was sent for Ernest Owens and a wanted card and a General Radio Message were requested for Ernest Owens;

XII.    Activity Sheet dated 2/29/1984 listing Defendant Sgt. Westerman as supervising and Defendant Detective Nespoli as the assigned, stating that Detective Lynch and Defendant Detective Hughes brought Tyrone Cooper to the Homicide Division, that Tyrone Cooper first told Detectives Hughes and Lynch that his

33

cousin Larry Tucker, who worked for the decedent, told Tyrone Cooper that three males named Mark, Steve and Herbie did the shooting, after which Tyrone was polygraphed by Detective Jim Kilner on the following questions:

Q. Do you know for sure who murdered William Gambrell A. No.

Q. On 2-22-84, inside of the oil company, did you murder William Gambrell? A. No.

Q. Right now can you take me to the gun used to murder William Gambrell? A. No.

Q. Were you present inside of the oil company on 2-22-84 when Gambrell was shot? A. No.

The result of the lie detector test regarding the above questions was DI, (Deception Indicated).

After he failed the lie detector test Tyrone Cooper gave defendant Detective Edward Hughes a new story. Tyrone Cooper said that, although he had nothing to do with the robbery and murder, Larry Tucker, Edmund Jones and William Gambrell, the son of the deceased William Gambrell, had planned the robbery, and had specifically planned to rob the man who leaves the oil company with the money, and that how the robbery happened was totally different from the way it was planned.

XIII.    Activity Sheet dated 3/12/1984 listing Defendant Sgt. Westerman as supervising and Defendant Detective Nespoli as the assigned which states that Defendant Detective Nespoli told ADA Gordon about the fact that Ernest Owens could not

34

have been involved because he was locked up in South Carolina at the time of the robbery and that Defendant Detective Nespoli and ADA Gordon, Chief of the District Attorney's Homicide Unit, conferred on the issues of the identities made of Ernest Owens by the witnesses. This Activity Sheet also states that the arrest warrant that had been issued for Mr. Owens would be returned to the issuing authority and that a cancel message had been sent out and the Eastern Detective Division and Warrant Unit were notified of Owen's location.

**Evidence of Intentional Coverup of Misconduct Committed by Defendant Detectives**

132. Defendant Detective Nespoli, the assigned investigator in charge of the Gambrell Homicide investigation, was directly responsible for providing evidence and police paperwork to the trial prosecutor, and he intentionally concealed the above-mentioned exculpatory evidence from both the trial prosecutor and the defense in order to secure a conviction of Plaintiff in spite of the voluminous evidence exculpating Plaintiff and substantially contradicting the official police narrative.

133. Defendant Detectives Hughes, Ansel, and Alexander intentionally made materially false statements while testifying in court for Mr. Joseph's case in order to cover up the misconduct committed during the investigation and to cover up theirs and Detective Nespoli's intentional suppression of exculpatory evidence.

134. Detective Edward Hughes testified at trial about the purported statement he took from Mark Mitchell on March 4, 1984.

135. Defendant Detective Huges was asked if he had interviewed witnesses on the case, other than Mark Mitchell, and he replied that he had not.

35

136. Defendant Detective Hughes had in fact, on February 29, 1984, taken the statement of Tyrone Cooper who told Detective Hughes that Larry Tucker and Edmund Jones had been planning the robbery of the Metro Oil Co. with William Gambrell, a son of the deceased William Gambrell.

137. In that same statement Tyrone Cooper told defendant Detective Hughes that he recognized, from the photographs that defendant Detective Hughs had shown him of other suspects, Ernest Owens, Bruce Cooper, Larry Tucker, Nicholas Johnson, and Edmund Jones.

138. Defendant Detective Hughes had actually taken two statements from Tyrone Cooper on February 29, 1984, one before, and one after, Tyrone Cooper had failed a polygraph test specifically on the questions of whether or not Tyrone committed the robbery/murder, whether he was there when it happened, and whether he knew where the murder weapon was and whether he knew who killed Mr. Gambrell.

139. Defendant Detective Hughes lied on the stand to hide the existence of exculpatory evidence of alternate suspects and evidence that he knew undermined the false narrative he and the other defendant detectives were telling the jury.

140. Defendant Detective Hughes also lied on the stand when he falsely testified to the jury that he simply asked questions and then typed Mr. Mitchell's answers with no coercion or fabrication occurring whatsoever.

141. Defendant Detective Hughes offered that false testimony in order to get Mr. Joseph convicted in spite of the strong evidence undermining the case against Mr. Joseph that defendant Detective Hughes knew existed and kept hidden from the jury.

36

142. Defendant Detective Hughes offered false testimony to conceal the intentional suppression of exculpatory evidence.

143. Defendant Detective James Alexander took the February 25, 1984 statement of Thomas Dolan wherein Thomas Dolan identified Ernest Owens as one of the two robbers not wearing masks.

144. In that same statement Detective Alexander also recorded that Mr. Dolan identified Leonard Edwards as looking like the other robber that was not wearing a mask.

145. At trial defendant Detective Alexander testified that he showed seven photographs to Thomas Dolan on February 25, 1984.

146. When asked what Mr. Dolan's response to being shown the photos was, Detective Alexander replied merely "[h]e picked out one of the photos as looking like the man who did the shooting, but he couldn't positively identify him."

147. Defendant Detective Alexander purposely lied by omitting the fact that Thomas Dolan had positively identified Ernest Owens as the man that Thomas Dolan was now identifying as Herbert Baker.

148. Defendant Detective Alexander purposely omitted this fact to cover up the evidence showing that Mr. Dolan originally identified two people as being the unmasked robbers who looked nothing like Mr. Joseph and Mr. Baker, the two people who were charged as the two robbers who were not wearing masks.

149. In addition to this lie by omission, defendant Detective Alexander lied again.

150. He was asked if "what he told you was that the individual looks something like the man but it wasn't the man?"

151. Defendant Detective Alexander replied "[t]hat is correct."

152. That is not what Mr. Dolan said. Mr. Dolan's statement to defendant Detective Alexander that was hidden from the defense, the Court and the jury was "[this guy looks like the guy who did the shooting."

153. That statement was also recorded in an activity sheet typed by Detective Nespoli on February 25, 1984 which stated that Mr. Dolan said that the photograph of Leonard Edwards "looks like the man who did the shooting."

154. Defendant Detective Alexander willfully falsely testified at trial to hide the deliberate suppression of exculpatory evidence committed by him and the other defendant detectives which deprived Mr. Joseph of his right to a fair trial and caused his wrongful conviction for crimes of which he is innocent.

155. Defendant Detective Alexander was able to commit such brazen misconduct because the statement he took from Thomas Dolan was withheld from everyone except his fellow defendant detectives and supervisors who alone knew of the statement's existence.

156. Defendant Detective Ansel took the subsequent false clean-up photo array statements from Adrienn Crosby and Thomas Dolan on March 4, 1984, wherein they were coerced into falsely identifying Mr. Joseph and Herbert Baker.

157. Defendant Detective Ansel, however, knew these new identifications were false, because he obtained a search warrant for 917 W. Dauphin street back on February 25, 1984 after ADA Gordon approved the arrest warrant for Ernest Owens and the search warrant for his last known address at 917 W. Dauphin Street.

38

158. In the affidavit of probable cause that defendant Detective Ansel wrote in support of the application for the search warrant, defendant Detective Ansel swore that on February 25, 1984, Adrienn Crosby positively identified a photograph of Ernest Owens who resided at 917 W. Dauphin Street, as the shorter male who took money from Crosby's pockets.

159. Defendant Detective Ansel also swore in the affidavit of probable cause that on February 25, 1984, Thomas Dolan identified a photograph of Ernest Owens as one of the robbers.

160. When Defendant Detective Ansel testified at trial that Thomas Dolan viewed a photo array and identified Herbert Baker as the shooter, Detective Ansel was knowingly participating in the suppression of the previous positive identification that Thomas Dolan had made of Ernest Owens, a man who looked nothing like Herbert Baker.

161. When Detective Ansel testified at trial that Adrienn Crosby picked out Mr. Joseph from a photo array, Detective Ansel was knowingly participating in the suppression of the positive identification that Mr. Crosby had originally made of Ernest Owens and Nicholas Johnson, neither of whom looked anything like Mr. Joseph.

162. When Detective Ansel testified at trial that Mr. Crosby and Mr. Dolan identified Plaintiff and Mr. Baker, Detective Ansel was knowingly participating in the concealment of the fact that he had coerced those very same fabricated photo identifications from the witnesses.

163. Defendant Detective Ansel offered this false testimony for the purpose of covering up exculpatory evidence to achieve a conviction of Mr. Joseph.

39

164. Defendant Detective Ansel intentionally and knowingly covered up the evidence which contradicted the false narrative he and his fellow defendant detectives were offering to the jury accusing Mr. Joseph of being guilty of the crimes charged.

165. Aside from those omissions, Detective Ansel also offered up false testimony at a suppression motion litigated in the case.

166. When asked if he was aware of Adrienn Crosby making identifications prior to March 4, 1984, defendant Detective Ansel intentionally omitted the February 25, 1984 photo identifications made by Mr. Crosby of Ernest Owens and Nicholas Johnson which he knew about because he did the search warrant for 917 W. Dauphin Street for Ernest Owens' house citing Crosby's ID of Ernest Owens.

167. Again, defendant Detective Ansel offered this false testimony for the purpose of covering up exculpatory evidence, which he knew contradicted the false police narrative, to achieve a conviction of Mr. Joseph.

**The Philadelphia Police Department Failure to Train, Supervise, and Discipline its Homicide Detectives and the Philadelphia Police Department Custom, Policy, and Practice of Unconstitutional Misconduct Caused the Wrongful Conviction of Plaintiff.**

168. Pursuant to Philadelphia Police Department Homicide Division custom, policy, and practice in place in 1984 and 1985, all activity sheets were withheld from the defense and also from the prosecution so that the homicide detectives could keep track of everything in their file without disclosing the exculpatory and other discovery material that would undermine the detectives' theory of the case.

169.  Pursuant to Philadelphia Police Department Homicide Division custom, policy, and practice in place in 1984 and 1985, exculpatory evidence was also withheld from

40

the prosecution and the defense.

170. Defendant Detective Nespoli, the assigned detective whose responsibility it was to provide evidence and police paperwork to the prosecuting attorney, withheld the activity sheets from the prosecuting attorney and the defense in Plaintiff's case pursuant to the aforesaid policy practice and custom.

171. Defendant Detective Nespoli, the assigned detective whose responsibility it was to provide evidence and police paperwork to the prosecuting attorney, withheld the other exculpatory evidence from the prosecuting attorney and the defense in Plaintiff's case pursuant to the aforesaid policy practice and custom.

172. The misconduct committed by the individual defendants was caused by the established publicly known and longstanding Philadelphia Police Department Practice of failing to supervise, train, and discipline Homicide detectives to comply with clear and established constitutional requirements, and the City of Philadelphia's publicly known and longstanding acquiescence to established improper police customs policies and practices.

173. The defendant detectives' intentional suppression of exculpatory evidence, including but not limited to, the activity sheets in this case was misconduct committed as part of a broader well-documented pattern of misconduct officially condoned at the highest level at the Philadelphia Police Department.

174. As far back as the 1970's, and proceeding to and continuing past 1984 when Plaintiff was arrested, there existed a policy, practice, or custom of unconstitutional misconduct in the Homicide Division such as, coercive interrogations of suspects

and witnesses using such techniques as beatings, threats, intimidation, false promises, and isolating children and other vulnerable witnesses, fabrication of inculpatory evidence including incriminating statements, forcing people to sign false statements, and withholding and concealing exculpatory evidence, and then lying about that misconduct on official police paperwork and while testifying in court.

175. This unconstitutional misconduct which occurred as a matter of course pursuant to the aforementioned policy practice and custom was clearly known to the City of Philadelphia and the relevant policy makers due to state, federal, and local government investigations, including public hearings held by the Subcommittee on Crime and Corrections of the Pennsylvania House of Representatives Judiciary Committee on Organized Crime, Public Corruption and Civil Rights Violations in 1978 and the public hearings held before the United States Commission on Civil Rights in 1979 during which the Mayor of Philadelphia, President of the Fraternal Order of Police, The Chief Inspectors of the Detective Bureau and Internal Affairs Bureau, The Police Commissioner, the Solicitor of Philadelphia and other high ranking Philadelphia City and Police executive and command level staff were questioned about the rampant issues of unchecked misconduct in the Philadelphia Homicide Division including beating false statements out of witnesses and suspects, coercion, framing innocent people with fabricated evidence, and the failure of the Philadelphia Police Department to train, supervise, or discipline the officers involved in such misconduct.

176. The City of Philadelphia was also on notice of the aforementioned policy, practice, or custom of unconstitutional misconduct in the Homicide Division such as, coercive interrogations of suspects and witnesses using such techniques as beatings, threats, intimidation, false promises, isolation, fabrication of inculpatory evidence including incriminating statements, forcing people to sign false statements, and withholding and concealing exculpatory evidence, and then lying about that misconduct on official police paperwork and while testifying in court due to complaints from attorneys, non-profit organizations such as the NAACP and others, internal police investigations, local government investigations, and newspaper articles such as the 1977 Pulitzer Prize winning series "The Homicide Files" which documented a pattern of egregious misconduct committed during the mid-to-late 1970's and revealed that "many homicide detectives, in beating or coercing suspects and later denying it under oath, have come to accept breaking the law as part of their job."

177. Indeed, in one case in 1975, a man's statement was thrown out after a Court of Common Pleas judge heard evidence that showed after three homicide detectives were done with him, the man had been stabbed in the groin and beaten so badly that he required a lengthy hospital stay due to severe injuries to his kidneys causing urination of blood and that the left side of his body from his shoulders to his buttocks was swollen and bruised.

178. The District Attorney's Office found enough evidence to prosecute four homicide detectives in that case, but after a secret meeting between the District Attorney, the

Police Commissioner, and the City Managing Director, the decision was made to transfer the detectives out of the Homicide Division, who were then transferred back to the Homicide Division several months later.

179. No prosecution where a man was stabbed in the groin and beaten until he urinated blood, no discipline, no training, no firing, and then a quiet transfer back to their old positions as homicide detectives.

180. As part of the 1977 "Homicide Files" series, the Inquirer printed an official reply from the Police Commissioner about the pattern of egregious misconduct in which the Commissioner simply denied that there was a pattern of illegal interrogations even though 31 of the Homicide Division's 84 detectives were implicated in pattern of misconduct spanning more than eighty cases. The Commissioner, the Mayor, the District Attorney, and the Chief Inspector all refused interviews regarding this subject and the Commissioner refused to make available the 31 detectives implicated in the investigation.

181. This pattern of misconduct continued unchecked into the 1980's, the time of the investigation of the Gambrell murder in 1984, and well into the 1990's.

182. During that time there was a Philadelphia Police Department policy, practice, or custom of constitutional rights violations on a systemic level.

**Miguel Rivera and Paul Valderrama**

183. In 1973 Miguel Rivera, Paul Valderrama, Juan Garcia and three other men were arrested for rape and murder. Homicide detectives coerced a false statement from co-defendant Juan Garcia and beat a false confession out of Miguel Rivera. Based

44

primarily on the false testimony of Juan Garcia, Miguel Rivera, Paul Valderrama, and the four other defendants were all convicted of murder and rape.

184. In 1981 Juan Garcia admitted to an investigator that none of the six men had any involvement in the crimes. Mr. Valderrama's attorney subsequently obtained new evidence confirming that Mr. Valderrama had not been in the U.S. during the time of the crimes and won a new trial with that evidence. The charges against Mr. Valderrama were then withdrawn by the District Attorney's Office in 1979. Mr. Rivera's investigator also discovered that the prosecution withheld evidence helpful to Rivera's defense. Mr. Rivera was also administered a lie detector test requested by Philadelphia Inquirer Investigative reporters, which he passed.

185. Miguel Rivera was awarded a new trial and was retried. During the re-trial Juan Garcia, who had since been imprisoned for a parole violation, now reversed his recantation, but with the help of the new evidence that was uncovered, including alibi witnesses, Mr. Rivera was found not guilty in 1987.

**Robert Wilkinson**

186.  In 1975 Philadelphia Homicide detectives beat, threatened, or coerced eight people, including Robert Wilkinson, into making false statements during a homicide investigation of a firebombing. Mr. Wilkinson's fabricated statement was suppressed by the trial court, but Mr. Wilkinson was convicted based on the false testimony of a minor.

187. That minor witness recanted this statement in a hearing in 1976 and Mr. Wilkinson's conviction was reversed and the charges against him were dismissed in 1977.

188. A federal investigation of the misconduct committed by Philadelphia Homicide detectives in the Wilkinson case led to the convictions of six Homicide detectives for federal civil rights violations. Throughout the prosecutions and after the convictions, the Mayor of Philadelphia at the time, Frank Rizzo publicly declared his support of those detectives and he decried their prosecutions as politically motivated.

189. In 1977 Mr. Wilkinson filed a civil lawsuit claiming, among other things, that the City of Philadelphia was liable to him via *Monell* because of the "repeated use of brutal and unlawful police methods and the City's refusal, through the acquiescence of a number of the most highly placed supervisory police officials, to enforce existing rules or laws prohibiting such conduct." The City of Philadelphia settled that lawsuit in 1980 for $325,000.

**Neil Ferber**

190. In 1981 Neil Ferber was arrested for a suspected mob killing. Mr. Ferber's conviction was achieved through the deliberate withholding of exculpatory evidence and the fabrication of evidence, both committed by Philadelphia Police Homicide detectives.

191. A jailhouse informant who identified Mr. Ferber to Philadelphia Police Homicide detectives failed a polygraph examination. This fact was withheld from the defense by the detectives. A homicide detective and a police sketch artist also used a mug shot of Mr. Ferber to create a police sketch instead of eye-witness descriptions thereby fabricating identification evidence.

192. Mr. Ferber was convicted in 1982. After the police misconduct came to light, Mr. Ferber was granted a new trial, and the charges were later withdrawn by the District Attorney's Office in 1986. The City of Philadelphia settled a civil suit filed by Mr. Ferber for his wrongful conviction for $1.9 million.

**Willie Stokes**

193. Philadelphia Police Homicide Detectives secured the wrongful conviction of Willie Stokes for a 1980 unsolved murder in 1984 by coercing a man named Franklin Lee to give a false statement identifying Willie Stokes as the murderer. The Detectives achieved this by telling Mr. Lee that they would hang him unless he cooperated.

194. The Homicide detectives set up meetings for Mr. Lee, first in 1983 with his girlfriend, and later with a sex worker, while he was incarcerated at which he could have sex and use drugs in the first of what became known as the "sex for lies" scandal.

195. Mr. Stokes was convicted based on the false testimony of Mr. Lee and remained imprisoned for a murder he did not commit until the misconduct was uncovered and his conviction was reversed by a federal district court. Mr. Stokes settled a lawsuit wherein he alleged Monell claims for failure to train supervise and discipline homicide detectives and the existence of unconstitutional policies practices and customs  for $9.62 million for the roughly thirty-seven years he was wrongfully incarcerated.

**Russell Williams**

196. In 1982 Russell Williams was convicted of 1st Degree murder for the killing of Fred Rainey. Homicide detectives hid the existence of two alternate suspects including

47

one man who ran a major gambling ring and was known for paying off police officers in Philadelphia.

197. Homicide detectives also fabricated ballistic evidence in that case and facilitated "sex for lies" meetings with a star witness's girlfriend who was allowed to bring in drugs for him to use while he was having sex with her.

198. Mr. Williams' conviction was vacated and he was released in 2024 after pleading guilty to 3rd degree murder for a negotiated time-served sentence.

### Shakur Harvey

199. In 1982 Shakur Harvey, a co-defendant of Russell Williams, was convicted of 1st Degree murder for the killing of Fred Rainey. Homicide detectives hid the existence of two alternate suspects including one man who ran a major gambling ring and was known for paying off police officers in Philadelphia.

200. Homicide detective also fabricated ballistic evidence in that case and facilitated "sex for lies" meetings with a star witness's girlfriend who was allowed to bring in drugs for him to use while he was having sex with her.

201. Mr. Harvey's conviction was vacated and he was released in 2024 after pleading to 3rd degree murder for a negotiated time-served sentence.

### Paul Satterfield

202. In 1985 Paul Satterfield, a black man with dark hair was convicted of a 1983 homicide in Philadelphia where two eyewitnesses told police that Paul Satterfield was not the man they saw running from the scene of the crime and one of the witnesses said the man running from the scene of the crime just after they heard the

gunshots was a white man with blonde hair.

203. A Philadelphia Homicide Detective purposely omitted that information from the affidavit of probable cause when seeking the arrest warrant for Mr. Satterfield.

204. At trial the prosecution kept the eyewitness who knew Mr. Satterfield was not the killer and who also knew the killer was white, sequestered at the District Attorney's Office preventing them from testifying to deprive Mr. Satterfield of a fair trial.

205. Mr. Satterfield was wrongfully convicted and sentenced to life without parole.

206. Mr. Satterfield was finally freed after spending 38 years in prison after his conviction was overturned in the Eastern District of Pennsylvania due to that and other misconduct committed by the Commonwealth and the District Attorney's Office declined to pursue a re-trial.

**Curtis Crosland**

207. In 1987, PPD Homicide Detectives, including defendant Detective Ansel, used a false statement that they knew was false to charge Curtis Crosland for a 1984 robbery/murder.

208. Defendant Detective Ansel and other Homicide detectives knew the statement was false because the informant had failed a polygraph test, given police inconsistent information, and told family members someone who was not Curtis Crosland had committed the crime.

209. The detectives, including defendant detectives Nespoli, Brignola, Ansel, Hughes, then hid the existence of exculpatory evidence, including alternate suspect evidence and the evidence showing that the informant's statement was false to

knowingly achieve a false conviction of Mr. Crosland in 1989.

210. Mr. Crosland was released after the District Attorney's Office Conviction Integrity Unit conceded that exculpatory evidence was withheld by the police and a federal district court vacated Mr. Crosland's conviction.

### Andrew Swainson

211. In 1989 Andrew Swainson was wrongfully convicted of a 1988 murder in a drug house due to the misconduct of Philadelphia Homicide detectives, including Defendant Detective James Alexander, who fabricated evidence that Mr. Swainson fled from Philadelphia to avoid prosecution.

212. This fabricated fugitive from justice evidence was used at trial to argue Mr. Swainson had a guilty conscience. Homicide detectives in this case also fabricated an eye-witness identification statement of Mr. Swainson, fabricated another witness statement, and intentionally hid evidence of alternative suspects from the defense.

213. Mr. Swainson's conviction was vacated in 2020 in light of this misconduct and all charges against him were dismissed.

### Arnett Carter

214. In 1989 Arnett Carter was wrongfully convicted of the 1987 homicide of Michael Thomas in Philadelphia. Eyewitness William Crum recanted his preliminary hearing testimony and prior statement while testifying at trial. Crum testified at trial that Philadelphia Homicide Detective Paul Worrell and another detective beat him unconscious and beat him and threatened him until he signed a false statement implicating Mr. Carter in the murder.

215. This first trial ended in a mistrial. At the re-trial, also in 1989, Crum refused to testify invoking the 5th Amendment. The Court deemed him unavailable to testify and allowed his preliminary hearing and trial testimony to be read into the records, and allowed Detective Worrell to read Crum's statement into the record.

216. The Court then instructed the jury that the preliminary hearing testimony and statement could be used as substantive evidence, but Crum's trial testimony recanting the preliminary hearing testimony and statement could only be used as impeachment evidence to determine credibility.

217. Mr. Carter's conviction was vacated in 2025 by the Superior Court of Pennsylvania which determined that Detective Worrell's established pattern and practice of coercing false confessions from witnesses called Mr. Carter's conviction into question since it was based solely on the testimony of Crum who was interrogated by Worrell a homicide detective known by the courts to have exhibited a pattern and practice of misconduct.

**Troy Coulston and Christopher Williams**

218. In 1992, Troy Coulston and Christopher Williams were wrongfully convicted of a 1989 murder of a man found shot in the back seat of a car. Philadelphia Police Homicide detectives knowingly obtained and used fabricated statements from multiple witnesses in order to charge Mr. Coulston and Mr. Williams while intentionally concealing exculpatory evidence. Defendant Detective Ansel concealed evidence proving that the statements and testimony of James White, a star witness, and alternate suspect in the murder, was demonstrably false. After the

51

District Attorney's Conviction Integrity Unit discovered exculpatory evidence, disclosed it to Mr. Coulston and Mr. Williams, and conceded their right to a new trial and likely innocence, Mr. Coulston's PCRA petition was granted in 2021 in the Philadelphia Court of Common Pleas and all charges were dismissed. Mr. Williams' conviction, along with three other murder convictions, all based on the fabricated testimony and statements of James White, was also vacated. Mr. Williams was released in 2021 after all charges against him were dismissed.

219. During the time of the Gambrell Homicide investigation and the prosecution of Plaintiff, the Philadelphia Police Department had a policy, practice, and custom of:

   a. Unconstitutional interrogations of suspects and witnesses, including using beatings, threats, and coercion;

   b. Fabricating and planting evidence, fabricating witness and suspect statements, using improper identification procedures;

   c. Intentionally withholding and concealing exculpatory evidence from the trial prosecutor and the defense and testifying falsely to cover up misconduct;

   d. Withholding and concealing the existence of Activity Sheets;

   e. Failing to properly train and supervise officers in conducting investigations within the bounds of the constitutional rights of suspects and witnesses and according to generally accepted police practices;

   f. Failing to discipline or otherwise correct the actions of police officers who committed unconstitutional or illegal conduct such as detectives who were aware of and concealed and/or aided and abetted constitutional rights

violations by other officers, which caused and encouraged police officers such as the defendant detectives and their supervisors to violate the rights of people like Plaintiff;

g.  Being deliberately indifferent to and ignoring systemic patterns of police misconduct engaged in during the course of investigations and prosecutions including unlawful interrogation methods, coercion of suspects and witnesses, fabricating evidence, unlawful identification procedures, and suppressing exculpatory evidence.

220. The Philadelphia Police Department and the City of Philadelphia, though they were specifically warned by State and Federal legislators, judges and other leaders in the legal community and public watchdogs of the longstanding well-known unconstitutional policies practices and customs listed above, kept them in place.

221. The aforementioned pattern and practice of misconduct was facilitated by the Philadelphia Police Department's failure to have proper systems in place for finding and disciplining violations of fundamental rights of suspects and witnesses.

222. Prior to, during, and continuing on for many years after, the City of Philadelphia and the Philadelphia Police Department was deliberately indifferent to, and did fail to act on, the dire need to train supervise and discipline officers, to prevent the serious misconduct described above, and thereby put a stop to the culture of violence and routine violations of the constitutional rights of suspects with virtually no accountability.

223. This deliberate indifference led to the foreseeable consequence of uncorrected and

even encouraged and facilitated misconduct resulting in wrongful convictions of innocent people like Plaintiff, who served over 41 years for a crime he did not commit.

224. The Philadelphia Police Department and the City of Philadelphia, though they were specifically warned by State and Federal legislators, judges and other leaders in the legal community and public watchdogs of the longstanding inadequacies in the Internal Affairs Division, failed to set standards and to establish discipline for officers guilty of abusive behavior to citizens.

225. These failures included:

   a. Routine and excessive delays in the handling of disciplinary complaints;

   b. Failing to properly train and discipline a large amount of police officers found to have committed misconduct;

   c. Failing to provide consistent, logical, and meaningful disciplinary actions;

   d. The Internal Affairs Division complaint investigation process was arbitrary, lacked consistency, and fell well below accepted police practices;

   e. The Internal Affairs Division investigators routinely and systematically gave the benefit of the doubt to police officers over complainants;

   f. Substantial defects in Internal Affairs Division investigations;

   g. The absence of a progressive Internal Affairs system in place including an early warning system to identify "problem" officers and maintain oversight of them and allow for discipline that was proportionate to the number of violations an officer had;

54

h.  The routine failure of Internal Affairs investigators to interview witnesses and the routine inadequacy of the interviews that were conducted which did not meet acceptable police practice standards;

i.  Ignoring disproportionate use of force by police officers on members of the public including suspects and witnesses; and

j.  Failing to properly train and supervise Internal Affairs Division investigators.

226.  The well-known and deep-rooted failures in the Philadelphia Police Department disciplinary system fostered systemic failures in the day-to-day supervision, training, and discipline of officers by their direct superiors allowing officers such as the individual defendant detectives in this case to commit investigative and criminal misconduct with virtually no fear of consequences for their wrongful actions.

## V.  CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS OF LAW AND DENIAL OF A FAIR TRIAL BY FABRICATING EVIDENCE

227.  Defendant John Della Rocca, as personal representative of the Estate of Edward Hughes and the Estate of Albert Nespoli, Defendant Karen Ansel, as personal representative of the Estate of Francis Ansel, Defendant James Alexander, and Defendant Arnold Gordon, acting individually and in concert, and acting within the scope of their employment, fabricated evidence in support of the prosecution of Plaintiff, Eric Joseph, and/or aided and abetted the introduction of fabricated evidence. This fabrication of evidence caused Plaintiff's wrongful conviction in violation of his right to a fair trial and due process of law pursuant to the Fourteenth Amendment to the United States Constitution.

**COUNT II: 42 U.S.C. § 1983 DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS OF LAW AND DENIAL OF A FAIR TRIAL BY INTENTIONALLY CONCEALING AND DELIBERATELY SUPPRESSING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE**

228. Defendant John Della Rocca, as personal representative of the Estate of Edward Hughes and the Estate of Albert Nespoli, Defendant Karen Ansel, as personal representative of the Estate of Francis Ansel and Defendant James Alexander acting individually and in concert, and acting within the scope of their employment, deprived Plaintiff, Eric Joseph of his clearly established constitutional right to due process of law and to a fair trial pursuant to the Fourteenth Amendment to the United States Constitution by intentionally concealing and deliberately suppressing exculpatory evidence in order to secure Plaintiff's wrongful conviction.

**COUNT III: 42 U.S.C. § 1983 MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS**

229. Defendant John Della Rocca, as personal representative of the Estate of Edward Hughes and the Estate of Albert Nespoli, and Defendant Karen Ansel, as personal representative of the Estate of Francis Ansel, acting individually and in concert, and acting within the scope of their employment did with malice and the knowledge that probable cause did not exist, caused Plaintiff, Eric Joseph, to be arrested charged and prosecuted for the Gambrell robbery/homicide in violation of Plaintiff's clearly established rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free from malicious prosecution.

**COUNT IV: 42 U.S.C. § 1983 SUPERVISORY LIABILITY CLAIM**

56

230.  Defendant, Linda Westerman, as personal representative of the Estate of Frederick Westerman, and Luis A. Silva, as personal representative of the Estate of John Lanzelotti, acted themselves, and allowed the defendant detectives, Nespoli, Ansel, Hughes, and Alexander to act with no accountability or fear of consequences in an environment wherein they were not adequately trained, supervised, or disciplined by Sgt. Frederick Westerman and/or Lt. John Lanzelotti, both in the Gambrell homicide investigation and prosecution and as a matter of policy practice and custom. Sgt. Westerman and Lt. Lanzelotti acted recklessly and/or with deliberate indifference to Plaintiff's constitutional rights by failing to adequately train, supervise, and discipline the detectives who were assigned to and/or who worked  on the Gambrell homicide investigation, including Defendant Detectives Nespoli, Ansel, Huges,  and Alexander thereby allowing and causing these detectives to deprive Plaintiff of his clearly established constitutional rights, such as his rights to be free from the denial of a fair trial due to the intentional suppression and concealment of exculpatory evidence and the fabrication of evidence pursuant to the 14th Amendment to the United States Constitution and the right to be free from a malicious prosecution pursuant to the 4th and 14th Amendments to the United States Constitution. Both Sgt. Westerman and Lt. Lanzelotti were personally involved in the Gambrell Homicide investigation and directly supervised the investigative actions taken by themselves and Detectives Nespoli, Ansel, Hughes, Alexander, and the other detectives who worked on the investigation. The deliberately indifferent and reckless conduct of Sgt. Westerman and Lt. Lanzelotti violated clearly established duties during the time of the

57

investigation in 1984-1985 to supervise the defendant detectives and no reasonable police supervisor in 1984-1985 would have believed that deliberately indifferent and reckless supervision in light of actual and/or constructive notice of misconduct by their subordinates was lawful. Sgt. Westerman's and Lt. Lanzelotti's above-described acts were the direct and proximate cause of Plaintiff's injuries and these two supervisors knew or should have known that their conduct would result in the above-described violations of Plaintiff's rights such as his rights to be free from the denial of a fair trial due to the intentional suppression and concealment of exculpatory evidence and the fabrication of evidence pursuant to the 14th Amendment and the right to be free from a malicious prosecution pursuant to the 4th and 14th Amendments.

### COUNT V: 42 U.S.C § 1983 CIVIL RIGHTS CONSPIRACY

231. Defendant John Della Rocca, as personal representative of the Estate of Edward Hughes and the Estate of Albert Nespoli, Defendant Karen Ansel, as personal representative of the Estate of Francis Ansel, Defendant James Alexander, and Defendant Arnold Gordon, acting individually and in concert, and acting within the scope of their employment and under the color of state law, agreed among themselves and with other persons to act in concert in order to deprive Plaintiff, Eric Joseph, of his clearly established rights to be free from the denial of a fair trial due to the intentional suppression and concealment of exculpatory evidence and the fabrication of evidence pursuant to the 14th Amendment and the right to be free from a malicious prosecution pursuant to the 4th and 14th Amendments. The acts and

58

omissions of the defendants described above were the direct and proximate cause of the harms suffered by Plaintiff and the defendants knew or should have known that their conduct would result in the above-mentioned rights violations and resulting wrongful prosecution convictions and over forty-one year incarceration. Aside from the above-described misconduct committed by each defendant, the defendants each had opportunities to intervene to prevent the denial of a fair trial due to the intentional suppression and concealment of exculpatory evidence and the fabrication of evidence pursuant to the 14th Amendment and the right to be free from a malicious prosecution pursuant to the 4th and 14th Amendments and by failing to intervene these defendants did violate Plaintiff's clearly established Constitutional rights.

### COUNT VI 42 U.S.C § 1983 MUNICIPAL LIABILITY CLAIM

232. Defendant the City of Philadelphia, with deliberate indifference, adopted and/or acquiesced in policies, practices and customs that were a moving force in the violation of Plaintiff, Eric Joseph's constitutional rights. Defendant, City of Philadelphia acting and/or failing to act with deliberate indifference, failed to properly train, supervise, and/or discipline police officers, supervisors, and detectives and those failures were a moving force in the violations of Plaintiff, Eric Joseph's Constitutional Rights.

### COUNT VII PENNSYLVANIA STATE LAW MALICIOUS PROSECUTION CLAIM

233. With actual malice and not for the purposes of bringing him to justice, Defendant John Della Rocca, as personal representative of the Estate of Edward Hughes and the Estate of Albert Nespoli, Defendant Karen Ansel, as personal representative of the

59

Estate of Francis Ansel initiated a criminal proceeding against Plaintiff, Eric Joseph without probable cause or caused one to be initiated without probable cause to do so causing Plaintiff the above-described injuries. The criminal proceeding ended in Plaintiff's favor.

## VI.   DAMAGES

234.  As a direct and proximate result of the actions and omissions of defendants, Plaintiff, Eric Joseph, suffered injures and damages, including loss of freedom for forty-one years one month and seven days, loss of the most productive years of his life as he was twenty years old when he was sentenced to life without parole, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of psychological development, restrictions on virtually all types of personal freedom such as, what and when he ate, when and where he slept, who he could see and talk to, personal contact with others, educational vocational and creative opportunities, personal fulfillment, recreational activity, sexual activity, family relations, reading, television, movies, travel, freedom of speech and expression. Mr. Joseph's mother died while he was incarcerated having never learned the truth exposed by the evidence hidden in the Homicide file. Mr. Joseph's brother died three days before his release, and three days too late for one final embrace.

WHEREFORE, Plaintiff, Eric Joseph, requests the following relief:

   a.  Compensatory damages as to all defendants, jointly and severally;

   b.  Punitive damages as to all individual defendants;

60

c.  Pre-judgment and post-judgment interest, and reasonable attorneys' fees and

costs via 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims;

d.  Trial by jury; and

e.  Such other and further relief as may appear just and appropriate.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff designates the undersigned as trial counsel.

Derek A. Steenson, Esquire
PA ID No. 310011
100 S. Broad Street, #812B
Philadelphia, PA 19110
(215) 253-8658
*Counsel for Plaintiff*

VERIFICATION

I, *Eric Joseph*, am the plaintiff in this action and hereby verify that the statements made in the foregoing pleading are true and correct to the best of my knowledge, information, and belief.

I understand that the statements in said pleading are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Date: 5/10/2026

Signature